**2017-2012, -2013, -2014, & -2074**

# United States Court of Appeals for the Federal Circuit

PARKERVISION, INC.,

*Appellant*,

*v*.

QUALCOMM INCORPORATED, QUALCOMM ATHEROS, INC.,

*Cross-Appellants.*

*Appeals from the United States Patent and Trademark Office, Patent Trial and Appeal Board in Nos. IPR2015-01828, IPR2015-01829, and IPR2015-01831*

## RESPONSE AND CROSS-APPEAL BRIEF OF CROSS-APPELLANTS QUALCOMM INCORPORATED AND QUALCOMM ATHEROS, INC.

MATTHEW J. BRIGHAM
BENJAMIN G. DAMSTEDT
DENA CHEN
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304
650.843.5000
mbrigham@cooley.com
bdamstedt@cooley.com
dchen@cooley.com

EAMONN GARDNER
COOLEY LLP
4401 Eastgate Mall
San Diego, CA 92121
858.550.6000
egardner@cooley.com

ORION ARMON
COOLEY LLP
380 Interlocken Crescent, Suite 900
Broomfield, CO 80021
720.566.4000
oarmon@cooley.com

*Attorneys for Cross-Appellants Qualcomm Incorporated and Qualcomm Atheros, Inc.*

January 16, 2018

# CERTIFICATE OF INTEREST

Counsel for Cross-Appellants certify the following:

1. The full name of every party or amicus represented by me is:

   Qualcomm Incorporated
   Qualcomm Atheros, Inc.

2. The name of the real party in interest (Please only include any real party in interest NOT identified in Question 3. below) represented by me:

   The parties named in the caption, Qualcomm Incorporated and Qualcomm Atheros, Inc. are the real parties-in-interest.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

   Qualcomm Incorporated is the parent corporation to Qualcomm Technologies, Inc., which is the parent corporation to Qualcomm Atheros, Inc.

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

   COOLEY LLP
   Matthew J. Brigham
   Eamonn Gardner
   Benjamin G. Damstedt
   Orion Armon
   Dena Chen
   Timothy S. Teter (former)

5. The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly

affected by this court's decision in the pending appeal. See Fed. Cir. R. 47. 4(a)(5) and 47.5(b).

> This Court's decision in the pending appeal will directly affect *ParkerVision, Inc. v. Qualcomm Incorporated, et al.*, Case No. 6:14-cv-00687-PGB-KRS (M.D. Fla.).

Dated: January 16, 2018

*/s/ Eamonn Gardner*
Eamonn Gardner

# TABLE OF CONTENTS

**Page**


STATEMENT OF RELATED CASES ........................................................ 1

STATEMENT OF JURISDICTION ............................................................ 2

I. STATEMENT OF THE ISSUES ........................................................ 3

II. STATEMENT OF THE CASE .......................................................... 4

A. Overview of the Claimed Technology ....................................... 4

B. Krauss/Ariie *Inter Partes* Review (IPR2015-01829) ............... 13

1. Qualcomm's petition combined Krauss's overall architecture, including rectangular wave Signals D and E, with the mixer from Ariie. .................................. 13

2. ParkerVision raised only three arguments, each of which was rejected by the Board. .................................. 21

C. Nozawa/Philips/Maas *Inter Partes* Reviews (IPR2015-01828, -01831) ........................................................................ 26

1. Qualcomm's petition showed that the combination of Nozawa, Philips, and Maas taught each of the relevant claim limitations............................................... 26

2. The Board found the challenged apparatus claims unpatentable, but rejected the challenge to the method claims. ................................................................ 35

III. SUMMARY OF THE ARGUMENT ................................................ 40

A. Krauss/Ariie *Inter Partes* Review ............................................ 40

B. Nozawa/Philips/Maas *Inter Partes* Reviews ........................... 42

IV. ARGUMENT.................................................................................... 43

A. Standard of Review ..................................................................... 43

B. Krauss/Ariie *Inter Partes* Review – ParkerVision's Appeal .... 44

1. The Board properly rejected ParkerVision's waiver argument. ....................................................................... 44

2. The Court should reject ParkerVision's new motivation-to-combine argument. ................................. 54

# TABLE OF CONTENTS
(continued)

**Page**


C. Nozawa/Philips/Maas *Inter Partes* Reviews ............................ 58

1. Apparatus Claims – ParkerVision's Appeal – The Board correctly found the challenged apparatus claims unpatentable........................................................ 58

a. Qualcomm's petition showed that Nozawa and Philips taught the challenged claims, as ParkerVision's own calculations demonstrated........................................................ 58

b. The Board's decision did not rely on an untimely claim construction. ................................ 65

2. Method Claims – Qualcomm's Cross-Appeal – The Court should also find the challenged method claims unpatentable........................................................ 70

V. CONCLUSION AND STATEMENT OF RELIEF SOUGHT........... 73

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Application of Michlin*,
256 F.2d 317 (C.C.P.A. 1958) .......... 66

*In re Applied Materials*,
692 F.3d 1289 (Fed. Cir. 2012) .......... 43

*Belden v. Berk-Tek*,
805 F.3d 1064 (Fed. Cir. 2015) .......... 43, 53

*Bristol-Myers Squibb v. Ben Venue Labs.*,
246 F.3d 1368 (Fed. Cir. 2001) .......... 71

*Cisco Sys. v. Lee*,
557 F. App'x 963 (Fed. Cir. 2014) .......... 66

*In re Cuozzo Speed Techs.*,
793 F.3d 1268 (Fed. Cir. 2015) .......... 43

*Genzyme Therapeutic Prod. v. Biomarin Pharm.*,
825 F.3d 1360 (Fed. Cir. 2016) .......... 67, 72

*Hewlett-Packard v. Bausch & Lomb*,
909 F.2d 1464 (Fed. Cir. 1990) .......... 66

*Hewlett-Packard v. Mustek Sys.*,
340 F.3d 1314 (Fed. Cir. 2003) .......... 64, 65, 66

*Idemitsu Kosan v. SFC*,
870 F.3d 1376 (Fed. Cir. 2017) .......... 72

*Kennametal v. Ingersoll Cutting Tool*,
780 F.3d 1376 (Fed. Cir. 2015) .......... 71

*In re NTP*,
654 F.3d 1279 (Fed. Cir. 2011) .......... 43

**TABLE OF AUTHORITIES**
(continued)

**Page**

*In re NuVasive*,
841 F.3d 966 (Fed. Cir. 2016) .......... 66, 67

*Outdry Techs. v. Geox S.p.A.*,
859 F.3d 1364 (Fed. Cir. 2017) .......... 57, 58

*ParkerVision, Inc. v. Qualcomm Incorporated, et al.*,
Case No. 6:14-cv-00687-PGB-KRS (M.D. Fla.) .......... 1

*ParkerVision v. Qualcomm*,
621 F. App'x 1009 (Fed. Cir. 2015) .......... 1

*ParkerVision v. Qualcomm*,
627 F. App'x 921(Fed. Cir. 2015) .......... 1

*Purdue Pharm. Prods. L.P. v. Actavis Elizabeth*,
627 Fed. Appx. 931 (Fed. Cir. 2016) .......... 68

*Sanofi-Aventis v. Pfizer*,
733 F.3d 1364 (Fed. Cir. 2013) .......... 43

*SRAM v. AD-II Eng'g*,
367 F. App'x 150 (Fed. Cir. 2010) .......... 71

*Unwired Planet v. Google*,
841 F.3d 995 (Fed. Cir. 2016) .......... 64, 65, 66

*VirnetX v. Apple*,
665 F. App'x 880 (Fed. Cir. 2016) .......... 43

**Statutes**

28 U.S.C.
§ 1295(a)(4)(A) .......... 2

35 U.S.C.
§ 141 .......... 2
§ 319 .......... 2

**TABLE OF AUTHORITIES**
(continued)

**Page**

**Other Authorities**

Fed. R. App. P.
§ 10(e)(2)(C) ........................................................................................22

Federal Circuit Rule
§ 47.5 ....................................................................................................1

## STATEMENT OF RELATED CASES

In accordance with Federal Circuit Rule 47.5, counsel for Cross-Appellants Qualcomm Incorporated and Qualcomm Atheros, Inc. (collectively, "Qualcomm") state:

- Qualcomm is unaware of any other appeals or petitions before the Patent and Trademark Office or this Court for the same proceedings.
- This Court's decision in the pending appeal will directly affect *ParkerVision, Inc. v. Qualcomm Incorporated, et al.*, Case No. 6:14-cv-00687-PGB-KRS (M.D. Fla.). U.S. Patent No. 6,091,940 (the "'940 patent"), the patent at issue in this appeal, is among the asserted patents in that action, which is currently stayed.
- In a prior appeal to this Court, the parties addressed patents in the same patent family as the '940 patent. *See ParkerVision v. Qualcomm*, 621 F. App'x 1009 (Fed. Cir. 2015); *ParkerVision v. Qualcomm*, 627 F. App'x 921(Fed. Cir. 2015).

## STATEMENT OF JURISDICTION

This is an appeal and cross-appeal of three final written decisions by the Patent Trial and Appeal Board, dated March 7, 2017 in IPR2015-1828, IPR2015-1829, IPR2015-1831. (Appx1-65.) Appellant ParkerVision filed timely notices of appeal on May 9, 2017. Cross-Appellant Qualcomm filed a timely notice of appeal on May 19, 2017. (Appx525-529.) This Court has subject matter jurisdiction over this appeal and cross-appeal pursuant to 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. §§ 141 and 319.

## I. STATEMENT OF THE ISSUES

The issues presented by ParkerVision's appeal are:

1. For the appeal regarding IPR2015-1829, whether the Board correctly rejected ParkerVision's waiver argument where Qualcomm's petitions repeatedly disclosed the use of Krauss's rectangular-wave signals as the claimed "first oscillating signal" and "second oscillating signal" of the recited claims.

2. For the appeals regarding IPR2015-1828 and -1831, whether the Board correctly held that Qualcomm's petitions provided sufficient evidence that the combination of Nozawa and Philips produced a "plurality of harmonics" for the challenged apparatus claims.

The issue presented by Qualcomm's cross-appeal is:

3. For the appeal regarding IPR2015-1828, whether the Board erred in concluding that Qualcomm failed to provide sufficient evidence that a person of ordinary skill would have performed the claimed method, even though the apparatus was known and the method would have resulted from using the apparatus within its known operating range.

## II. STATEMENT OF THE CASE

### A. Overview of the Claimed Technology

The '940 patent is the sole patent at issue in these consolidated appeals. The '940 patent is directed to electronic devices, such as cellular phones, that "up-convert" a *low-frequency* information signal to a *high-frequency* signal that can be transmitted. (Appx602, col. 1:23-24 ("The present invention is generally directed to frequency up-conversion of electromagnetic (EM) signals."); *id.*, col. 1:46-48.) Frequency conversion has been used in wireless communications since the late 1800s, including transmitters that up-convert and receivers that down-convert. (*E.g.*, Appx3505-3508; Appx3542-3546; Appx602, col. 1:25-43; Appx676-678 (providing background regarding wireless transmitters).)

As part of the up-conversion process, the '940 patent uses a switch to "gate" an input signal that contains the information to be transmitted. (Appx602, col. 2:8-10 ("As the switch opens and closes, it gates ... the information signal.").) The '940 patent refers to the signal used to control the switch as the "oscillating signal." (Appx533, abstract ("The up-conversion is accomplished by controlling a switch with an oscillating signal ...."); Appx602, col. 1:58-2:21.) The switch "opens and closes as a function of the

frequency and pulse width" of the oscillating signal. (Appx602, col. 1:65-67; Appx618, col. 33:59-34:5; PV Br. at 7-8 ("The oscillating signal controls whether the switch is in the open or closed state ...."); *id.* at 9 ("The frequency of the oscillating signal determines the rate at which the switch will open and close").) The '940 patent describes a "rectangular waveform" as a preferred embodiment of the oscillating signal that controls the switch. (*E.g.*, Appx619, col. 35:8-24).) According to the '940 patent, controlling the switch with the oscillating signal will result in a "harmonically rich waveform" with the properties of a rectangular waveform. (E.g., Appx619, col. 34:65-67 and col. 35:25-37.)

A rectangular waveform is a waveform whose shape, as a function of amplitude over time, is "substantially rectangular." (Appx609, col. 15:51-56 (the term "rectangular waveform," as used in the '940 patent, "will refer to waveforms that are substantially rectangular," and does not require "an exact or perfect rectangular waveform").) "One form of a rectangular wave is the square wave, where the signal is at a first state (e.g., high) for the same amount of time that it is at the second state (e.g., low)." (Appx621, col. 40:64-67; Appx609, col. 15:56-60.) As shown below, Figure 42A depicts

a sinusoidal waveform, Figure 42C depicts a square waveform, and Figure 42E depicts a rectangular waveform. (Appx575, Figs. 42A, 42C, 42E.)

| ‘940 Patent, Figs. 42A, 42C, 42E (Appx575) |
|---|
|  |

According to long-known principles of physics and mathematics, a rectangular waveform “is comprised of a plurality of sinusoidal waves whose frequencies are integer multiples of the fundamental frequency of the waveform.” (Appx613, col. 23:6-11.) “These sinusoidal waves are referred to as the harmonics of the underlying waveform.”[1] (*Id.*, col. 23:11-15.)

[1] A depiction of a fundamental frequency, along with second, third, and fourth harmonic frequencies, is shown at Appx2114. As depicted, for each cycle of the fundamental wave, the second harmonic wave has two cycles, the third harmonic wave has three cycles, and the fourth harmonic wave has four cycles. (*Id.*)

The principles governing rectangular waveforms have been known for centuries, as the ‘940 patent acknowledges:

> A discovery made by Baron Jean B. J. Fourier (1768-1830) showed that continuous and periodic waveforms are comprised of a plurality of sinusoidal components, called harmonics. More importantly, the frequency of these components are integer multiples of the frequency of the original waveform (called the fundamental frequency). The amplitude of each of these component waveforms depends on the shape of the original waveform. The derivations and proofs of Baron Fourier’s analysis are well known to those skilled in the relevant art(s).
>
> The most basic waveform which is continuous and periodic is a sine wave. It has but one harmonic, which is at the fundamental frequency....
>
> ....
>
> A more typical waveform is a rectangular wave, which is a series of pulses.... The mathematical analysis shows that there are harmonics at all of the multiples of the fundamental frequency of the signal. Thus, if the frequency of the rectangular waveform is $F_r$, then the frequency of the first harmonic is $1*F_r$, the frequency of the second harmonic is $2*F_r$, the frequency of the third harmonic is $3*F_r$, and so on.... There are some harmonics for which the amplitude is zero. In the case of a square wave, for example, the “null points” are the even harmonics.

(Appx621, col. 40:32-41:12; Appx619, col. 35:30-35.) Consistent with this historical understanding, the ‘940 patent defines harmonics as integer

multiples of the fundamental frequency:

> Harmonic: A harmonic is a frequency or tone that, when compared to its fundamental or reference frequency or tone, is an integer multiple of it. In other words, if a periodic waveform has a fundamental frequency of "f" (also called the first harmonic), then its harmonics may be located at frequencies of "n*f," where "n" is 2, 3, 4, etc. The harmonic corresponding to n=2 is referred to as the second harmonic, the harmonic corresponding to n=3 is referred to as the third harmonic, and so on.

(Appx605, col. 8:22-30.)

So whereas a perfect sinusoid is a signal at just one frequency, a rectangular wave consists of signals—i.e., harmonics—at many higher frequencies; these additional signals act as interferers and must be filtered before transmission. In the '940 patent, "the output of the switch is filtered" so that unwanted harmonics are removed and the "desired harmonic is output." (Appx533, abstract; Appx602, col. 2:4-5, 2:19-21.)

Harmonics can also be constructively used in an old technique called "subharmonic"[2] up-conversion. Historically, it was difficult to create

[2] The terms "subharmonic" and "harmonic" are closely related. A 60 MHz oscillating signal is a *subharmonic* of a 900 MHz output frequency, because 60 MHz = 900 MHz / n, where n = 15. Similarly, a 900 MHz output frequency is a *harmonic* of a 60 MHz oscillating signal, because 60 MHz * n

oscillating signals at high enough frequencies to perform *direct* up-conversion, *i.e.*, up-conversion to the desired transmission frequency in one step. (Appx762-764.) Subharmonic up-conversion addresses that issue by using an oscillating signal that has a low fundamental frequency but also has a rectangular shape. Due to its shape, the low-frequency oscillating signal also contains harmonics at much higher frequencies. One of those high-frequency harmonics is then selected for use in the transmission process. (*Id*.) Sub-harmonic up-conversion has been known for many decades, being discussed, for example, in a patent issued to AT&T in 1929 that "proposes to use the modulation of the voice currents with a *harmonic* of the 'carrier' wave instead of the modulation of the voice with the *fundamental* 'carrier' wave." (Appx4402, col. 1:56-60 (emphasis added).)

The '940 patent focuses on subharmonic up-conversion, with "the frequency of the oscillating signal being selected as a sub-harmonic of the desired output frequency." (Appx533, abstract; Appx632, col. 62:57-59 ("The frequency of the oscillating signal 5704, 5738, 5744 must be a subharmonic of the frequency of the desired transmission signal 5714.").)

---

= 900 MHz, where n = 15. (Appx625, col. 47:26-31 (using 900 MHz and 60 MHz examples); Appx627, col. 52:53-59 (same).)

The ‘940 patent defines a “subharmonic” as “a frequency or tone that is an integer submultiple of a referenced fundamental frequency or tone.” (Appx606, col. 9:20-22.) In other words, for a fundamental frequency of “f,” “its subharmonics have frequencies of ‘f/n,’ where n is 2, 3, 4, etc.” (*Id.*, col. 9:22-27.)

The ‘940 patent gives an example where “the frequency of the desired transmission signal is 910 MHz.” [3] (Appx633, col. 63:2-3.) The following chart provides “[t]he first ten subharmonics of a 910.000 MHz signal,” where the first subharmonic is 910 MHz / 1, the second subharmonic is 910 MHz / 2, and so forth:

**‘940 Patent, Col. 63:13-24 (Appx633)**

| harmonic | frequency |
|---|---|
| 1st | 910.000MHz |
| 2nd | 455.000 |
| 3rd | 303.333... |
| 4th | 227.500 |
| 5th | 182.000 |
| 6th | 151.666... |
| 7th | 130.000 |
| 8th | 113.750 |
| 9th | 101.111... |
| 10th | 91.000 |

[3] “MHz” refers to one million Hertz, *i.e.*, one million cycles per second. “kHz” refers to one thousand Hertz, *i.e.*, one thousand cycles per second.

In this example, the 9th subharmonic is selected as the oscillating signal:

> The oscillating signal ... can be at any one of these frequencies or, if desired, at a lower subharmonic. For discussion herein, the 9th subharmonic will be chosen. Those skilled in the relevant art(s) will understand that the analysis herein applies regardless of which harmonic is chosen. Thus the nominal center frequency of the oscillating signal ... will be 101.1111 MHz.

(*Id.*, col. 63:25-31.) Due to its rectangular shape, the oscillating signal includes harmonics. The 9th harmonic of the 101.111... MHz oscillating signal is at the desired transmission frequency of 910.000 MHz (101.111... MHz * 9 = 910.000 MHz) and will be used in transmission. Before transmission, the signals resulting from the remaining, undesired harmonics are eliminated using a filter. (*E.g.*, Appx612-613, col. 22:62:23-30.)

One drawback of using subharmonic up-conversion is that the amplitude of harmonics is generally much lower than the amplitude of the "fundamental frequency." As a result, sub-harmonic up-converters may require more amplification, draining energy from a device more quickly. To try to mitigate that drawback, the '940 patent describes "pulse shaping," *i.e.*, adjusting the width of the rectangle to try to shift energy to the desired harmonic: "[P]ulse width is an important factor in assuring that the harmonic

waveform at the desired output frequency has sufficient amplitude to be useful without requiring elaborate filtering or unnecessary amplification." (Appx602, col. 1:58-2:5; Appx622, col. 41:39-43; Appx623, col. 43:57-63 (controlling the pulse shape to be "substantially optimized").) For example, Figure 60 provides a table that compares the amplitudes of the first 50 harmonics of rectangular waveforms with different pulse widths. (Appx595, Fig. 60; Appx622, col. 41:18-38; Appx625, col. 47:29-36.)

The '940 patent incorporates concepts of pulse shaping, harmonics, and filtering into the claims. For example, claim 21 recites:

> 21. An apparatus for frequency up-conversion, comprising:
>
> a pulse shaping module to receive an oscillating signal and to output a shaped string of pulses that is a function of said oscillating signal;
>
> a switch module to receive said shaped string of pulses and a bias signal, wherein said shaped string of pulses causes said switch module to gate said bias signal and thereby generate a periodic signal having a plurality of harmonics, said bias signal being a function of an information signal, said periodic \signal having an amplitude that is a function of said bias signal; and
>
> a filter coupled to said switch module to isolate one or more desired harmonics of said plurality of harmonics.

(Appx636, claim 21.)

### B. Krauss/Ariie *Inter Partes* Review (IPR2015-01829)

#### 1. Qualcomm's petition combined Krauss's overall architecture, including rectangular wave Signals D and E, with the mixer from Ariie.

Qualcomm filed a petition for *inter partes* review based on the Krauss[4] and Ariie[5] references ("Krauss/Ariie petition").[6] (Appx2960-3014.) The Krauss/Ariie petition was directed at independent claims 1 and 18 of the '940 patent, as well as related dependent claims asserted in the underlying district court action.[7] The Board instituted *inter partes* review proceedings (Appx3070-97), and issued a Final Written Decision finding all of the challenged claims unpatentable (Appx24-45).

---

[4] "Krauss" refers to H.L. Krauss et al., Solid State Radio Engineering (John Wiley & Sons 1980), Appx3661-3725.

[5] "Ariie" refers to U.S. Patent No. 6,680,078, M. Ariie, Mixer (issued Oct. 21, 1997), Appx3726-31.

[6] For several dependent claims, Qualcomm's petition relied on the following reference: P.J. Sullivan et al., Active Doubly Balanced Mixers for CMDS RFIC's, Microwave Journal (Oct. 1997), Appx3732-42 ("Sullivan"). ParkerVision did not contest any issues related to the Sullivan reference, either before the PTAB or on appeal. (Appx18-20; PV Br. at 49-51, 58-61.) Accordingly, this brief focuses on the Krauss and Ariie references.

[7] Asserted claims 2, 81-84, 86, 88-91, and 93-34 depend from claim 1, and asserted claims 251-54, 256, 258-61, and 263-64 depend from claim 18. (Appx635, Appx638-639, Appx646.)

Krauss is an engineering textbook from 1980 "about the analysis and design of the radio-frequency electronic circuits that are the building blocks of radio transmitters and receivers." (Appx3663.) Krauss is intended to be "both a reference for the working engineer and a textbook for senior-level students in electrical engineering and electrical technology." (*Id*.)

The proceedings focused on the disclosures from Krauss regarding "direct-conversion single side band ('SSB') transmitters." (Appx32.) Krauss "Figures 16-3(a) and (c) illustrate a direct-conversion SSB transmitter and the waveforms used in the transmitter." (*Id*.) In particular, "Figure 16-3(a) illustrates the block diagram of a direct-conversion SSB transmitter using phasing SSB generation," and Figure 16-3(c) shows the "frequency division waveforms" used by the transmitter. (Appx3724-3725.) Figures 16-3(a) and (c) are depicted below.

**Krauss, Fig. 16-3(a) and (c) (Appx3724)**

**Fig. 16-3 Direct-conversion SSB transmitters. (*a*) Using phasing method of SSB modulation; (*b*) using third method of SSB modulation; and (*c*) frequency-division waveforms.**




(*a*)




(*c*)

Krauss describes the components used in this transmitter architecture and the signals used and produced by the transmitter. The transmitter receives an "AF input" at the left of Figure 16-3(a). (Appx3724.) "'The audio input signal [AF input] is applied to a phase-splitting network that produces two audio signals that differ in phase by 90º.'" (Appx32 (quoting Appx3725).) At the bottom of the figure, "a variable-frequency

oscillator [VFO] operating at $4f_o$ [4 times the desired output frequency]" produces Signal A, which "is applied to a flip-flop whose outputs, B and C ... , are at frequency $2f_o$ [2 times the desired output frequency] and 180º out of phase." (Appx3725.) The flip-flop is a digital frequency divider depicted as a box surrounding "÷2". (Appx3724.) Division of Signals B and C "by a pair of flip-flop circuits then produces outputs D and E, which are of frequency $f_o$ and differ in phase by 90º." (Appx3725.) Signals D and E "are rectangular waves." (Appx10.) Krauss also refers to Signals D and E as the "in-phase and in-quadrature signals." (Appx3725.)

The two phase-shifted audio signals and Signals D and E "are then applied to two double-balanced mixers," which are each depicted as a circle surrounding a multiplication sign (X). (Appx3724-3725.) The double-balanced mixers are followed by a summer, which is depicted as a circle surrounding a plus sign (+), as well as low-pass filters and RF power amplifiers. (Appx3724; Appx3725 ("The outputs of the two mixers are summed and then amplified to the desired level.").)

Qualcomm's petition identified Signals D and E from Krauss as teaching, respectively, the "first oscillating signal" and "second oscillating signal" limitations of the '940 patent claims. For example, Qualcomm's

petition identified Signal D as the "First Oscillating Signal" and Signal E as the "Second Oscillating Signal" in an annotated and combined depiction of Krauss Figure 16-3(a) and (c). (Appx2992; Appx2998; *see also* Appx2994 (identifying "first oscillating signal 'D'" from Krauss); Appx2994-2995 (discussing Krauss's disclosure of gating); Appx3570-3572 (¶¶ 155-58); Appx3586-88 (¶¶ 181-84); Appx3612-3614 (¶¶ 224-27); Appx3629-3631 (¶¶ 252-55).) The annotated and combined depiction highlighted the rectangular shape of Signals D and E, which toggle switches between on states (when the rectangular waveform is high) and off states (when the rectangular waveform is low). (*E.g.*, Appx3523.)

**Krauss/Ariie Petition (Appx2992, Appx 2998) (annotations in petition)**



**Krauss/Ariie Petition (Appx2992, Appx 2998) (annotations in petition)**




Qualcomm's petition reiterated the mapping of Signals D and E to the first and second oscillating signals in the annotated figure below. (Appx3003.)

**Krauss/Ariie Petition (Appx3003) (annotations in petition)**




The declaration cited by and accompanying the petition likewise made clear that the first and second oscillating signals in Qualcomm's petition were

Signals D and E: "Krauss expressly discloses that *the oscillating signal corresponding to the recited 'first oscillating signal' (the signal 'D' in Fig. 16-3(a)) and the oscillating signal corresponding to the recited 'second oscillating signal' (the signal 'E' in Fig. 16-3(a))* are out of phase with respect to each other by 90°: '[oscillating signals] D and E, which are of frequency $f_o$ [the carrier frequency][,] ... differ in phase by 90°.'" (Appx3604-3607 (¶¶ 212-14) (emphasis added).)

Qualcomm's petition combined Krauss with Ariie, a prior art patent teaching a field-effect transistor ("FET") mixer:

> In the proposed combination, *each double-balanced mixer in Krauss Fig. 16-3(a) is replaced by a mixer such as that in Fig. 1 of Ariie*....

(Appx2993 (emphasis added).)

> Therefore, it would have been obvious to a POSA to substitute a mixer like that in Ariie Fig. 1 for each double-balanced mixer in Krauss Fig. 16-3(a).

(Appx2993-2994.)

> Recall also that, in the proposed combination, each double-balanced mixer in Krauss Fig. 16-3(a) is replaced by a mixer such as that in Ariie Fig. 1.

(Appx2997; Appx3005-3006 (same); Appx3567-3570, ¶¶ 151-54.)

Ariie teaches a FET mixer design that closely tracks the mixer disclosed in the '940 patent. In the '940 patent, the FET includes gate G

(3202) that receives the oscillating signal (3104). (Appx569 (Fig. 32A), Appx619-620 (col. 36:60-37:5).) Similarly, in Ariie, the FET includes gate G that receives the oscillating "carrier signal" ($s_c$). (Appx 3727 (Fig. 1), Appx3725 (col. 4:49-51).[8]) The mixer circuit in Ariie Figure 1 does not include circuitry for generating the oscillating signal; instead, it simply receives an oscillating signal generated by external circuitry via "signal input terminal $I_2$." (Appx3725 (col. 4:49-51).)

| '940 Patent, Fig. 32A (Appx569) | Ariie, Fig. 1 (Appx3727) |
|---|---|
| FIG. 32A  | FIG. 1  |





Qualcomm's petition laid out the motivation to combine Krauss with

[8] Appx33 ("Figure 1 of Ariie depicts FET Q1 connected to carrier signal $S_C$ at gate G, and to a composite signal that comprises data signal $S_S$ at drain D. [Ariie] at 4:16-21. The FET outputs mixed signal $S_O$, which includes components having frequencies of $nf_c \pm mf_s$, where n and m are positive integers. *Id.* at 4:55-61. The desired output frequency is selected from these component frequencies with the use of a filter. *Id.* at 4:61-64.").

the FET mixer design from Ariie. Qualcomm showed that the architecture in Krauss Fig. 16-3(a) is commonly referred to as an "orthogonal modulator" and that Ariie expressly discloses using its FET mixer in orthogonal modulators: "The present invention relates to mixers used for modulators such as orthogonal modulators ...." (Appx2989-2990 (citing Appx3726 (col. 1:5-10)); Appx34.) Ariie further disclosed that its FET mixer provides a low-power and compact design useful in a variety of transmitters. (Appx2989-90 (citing Appx3729 (col. 2:20-23)); Appx34.)

### 2. ParkerVision raised only three arguments, each of which was rejected by the Board.

ParkerVision raised three arguments[9] before the Board in response to the Krauss/Ariie petition.[10] ***First***, ParkerVision argued that Ariie, by itself, does not necessarily disclose a "switch module" that "gates" the bias signal.

[9] In its Patent Owner Preliminary Response, ParkerVision also argued that the combination of Krauss and Ariie would not generate the required "plurality of harmonics." (Appx3061.) ParkerVision abandoned that argument in its Patent Owner Response.

[10] ParkerVision conceded the remaining elements. (*E.g.*, Appx35 ("As to the remaining limitations of claims 1 and 18, as well as the additional limitations of the challenged dependent claims, we have reviewed Qualcomm's unchallenged arguments and evidence on these points (Pet. 25-45), find them persuasive that the references disclose the limitations, and adopt Qualcomm's analysis as our findings herein.").)

(Appx36 (citing Appx3157-3161).) ParkerVision did not dispute that, "when operated with the rectangular waves of Krauss, Ariie's FET acts as a switch."[11] (Appx37.) ParkerVision focused instead on Ariie in isolation, contending that "Ariie does not describe the FET as a switch" or describe the FET as "operating between two possible states, one closed and the other open." (Appx3159.) ParkerVision also cited testimony that, depending on its inputs, the "Ariie FET could ... operat[e] as a nonlinear device, rather than as a switch module operating between two possible states, one closed and the other open." (Appx3161; Appx4793 at 146:19-23 (noting that Ariie's FET is "operating as a switch" but that "it's possible in principle" to operate it in "other modes as well").)

The Board rejected ParkerVision's argument as improperly ignoring the combination of references at-issue in the IPR. The Board stated: "[I]n the

[11] In response to a question at the hearing, ParkerVision's counsel conceded that Ariie's FET mixer would operate as the claimed "switch" that "gates" when used with a rectangular wave oscillating signal. A technical error resulted in a portion of the transcript—Qualcomm's opening argument—becoming unrecoverable. Despite Qualcomm's request, the PTAB has refused to provide the remaining portion of the transcript, which would include ParkerVision's concession. (Appx3350.) To the extent that ParkerVision disputes the concession it made during the hearing, the Court may order production and review of the partial transcript. Fed. R. App. P. 10(e)(2)(C).

combination of references as proposed, the rectangular wave of Krauss would drive the Ariie FET as a switch. That switch, in turn, would cause the FET to gate the input signals of Krauss, satisfying the disputed limitations of the claims." (Appx37.) ParkerVision's arguments failed, because they were "directed to the disclosure of Ariie individually, rather than looking to the proposed combination." (*Id*.) The Board further emphasized:

> Krauss shows that its oscillating signal is a rectangular wave, and ParkerVision does not dispute that the rectangular wave necessarily would operate the FET as a switch. The fact that an FET could be driven with other waveforms—not taught in Figure 16-3 of Krauss—in a manner that is not a switch does not detract from our finding that the proposed combination of Krauss and Ariie discloses waveforms that drive the FET such that it acts as a switch.

(Appx37-38 (internal citations omitted).)

The Board also found that the "switch module" that "gates" limitations would be met by Ariie because "[t]he record is clear, and ParkerVision does not deny, that Ariie's FET is capable of being used as a 'switch module' that 'gates,' if it is driven with the proper input." (Appx38; *id.* ("In other words, ParkerVision cannot use functional language to distinguish the challenged apparatus claims over the structure disclosed by the proposed combination of Krauss and Ariie.").)

***Second***, ParkerVision argued that Qualcomm's petition did not disclose the use of Krauss's rectangular wave signals as the claimed first and second oscillating signals. (Appx3216.) The Board squarely rejected ParkerVision's waiver argument:

> We have evaluated ParkerVision's position and disagree that Qualcomm raised the argument for the first time in its Reply. In particular, we note that ***the Petition specifically highlighted the "First Oscillating Signal D" of Figure 16-3(c)—the rectangular wave***—and states that gate G of Ariie's FET Q1 would receive that signal.

(Appx36 at n.5 (emphasis added).)

***Third***, ParkerVision argued that a person of ordinary skill would not have substituted Ariie's FET mixers in place of the double-balanced mixers depicted in Krauss. (Appx3161-3164.) ParkerVision argued that double-balanced mixers "suppress the carrier in their output," but the FET mixer of Ariie would not have that feature. (Appx39.[12]) "Including the FET of Ariie in the circuit of Krauss, therefore, would result in a transmitter that no longer suppresses the carrier." (*Id*.)

---

[12] *Id.* ("By contrast, ParkerVision argues, the FET mixer of Ariie is unbalanced, meaning that its output will contain not only the desired frequency, but also the input and oscillating frequencies as leakage.").

The Board rejected ParkerVision's argument, finding that ParkerVision's focus on a single feature—carrier suppression—misconstrued the intended purpose of Krauss: "[I]t is more accurate to describe Krauss as directed to transmitters generally." (Appx40.) Moreover, ParkerVision's argument about a single potential disadvantage of Ariie's unsuppressed carrier approach ignored the potential advantages of such an approach, including "low or zero power consumption and easy, compact integration." (*Id*.) ParkerVision also failed to account for the fact that "transmitting the carrier may be beneficial" in certain circumstances. (*Id.* at n.6; *see also* Appx3180-3182.) "[O]n balance," the Board found "that the advantages of combining the teachings of the references as proposed by Qualcomm outweigh the alleged disadvantages." (Appx41; *see also* Appx40-41 ("We cannot conclude that incorporating an unbalanced mixer into Krauss' transmitter would so frustrate its operation that a person of ordinary skill in the art would not contemplate the modification.").)

Accordingly, in the 1829 *inter partes* review, the Board found each of the challenged claims unpatentable.

### C. Nozawa/Philips/Maas *Inter Partes* Reviews (IPR2015-01828, -01831)

#### 1. Qualcomm's petition showed that the combination of Nozawa, Philips, and Maas taught each of the relevant claim limitations.

Qualcomm filed two petitions seeking *inter partes* review of the '940 patent based on Nozawa[13], Philips[14], and Maas[15]. (Appx84; Appx5137.) The 1828 petition was directed at independent claims 21 and 25 of the '940 patent and several dependent claims.[16] The 1831 petition was directed at independent claims 4 and 22 of the '940 patent and several dependent

[13] "Nozawa" refers to the combination of the Japanese and English-translated versions of Y. Nozawa, The Merigo Method: SSB Generator/Producing a Demodulator, HAM Journal, No. 86, dated July/Aug. 1993, as well as the translator's declaration. (Appx805-830.) References here are to the undisputed English translation (Appx818-830).

[14] "Philips" refers to the Philips Semiconductor Data Sheet titled "74HC/HCT4052: Dual 4-Channel Analog Multiplexer/Demultiplexer" and dated December 1990. (Appx831-845.)

[15] "Maas" refers to excerpts from S. Maas, Microwave Mixers (2d ed. Artech House Publishers 1993). (Appx1706-1742.)

[16] Claims 281, 283-286, 288-289, and 293 depend from claim 21, and claims 26, 363-366, 368-369, and 373 depend from claim 25. (Appx636, Appx647, Appx650-651.)

claims.[17] The Board instituted *inter partes* review (Appx192-221; Appx5247-5279), and issued Final Written Decisions (Appx1-23; Appx46-65).

Nozawa is a 1993 article published in HAM Journal, a Japanese-language publication for HAM radio enthusiasts. (Appx723-729, ¶¶ 142-148.) Nozawa teaches a "Single Sideband" (SSB) method for transmitting and receiving audio signals. (Appx818-819.) Nozawa's design was based on his "Merry-Go-Round Vision," an insight he gained while watching his sons play on a merry-go-round. (Appx819-820.) In the section titled "Principles of SSB Generation," Nozawa notes that "an SSB signal can now be output by using a rotary switch." (Appx820.) Nozawa describes the oscillating signal that controls the switch as a square wave. (*Id.* ("[W]hat would be the result if it [the local oscillator signal] were a square wave? The result is that an SSB is acquired with no problems.").) Nozawa depicts its square-wave local oscillator signal in Figure 2. (*Id.*) The overlap of the two square-wave signals creates four components used as Nozawa's local oscillator signals. (*Id.*)

[17] Claims 100, 113-116, and 118-119 depend from claim 4, and claims 23, 309-312, 314-315, and 319 depend from claim 22. (Appx635-636, Appx639-640, Appx648.)

**Nozawa, Fig. 2 (Appx820)**

**FIG. 2: Waveform where DBM is activated with square wave (1 cycle)**




Nozawa applied his design in a circuit simulation and a prototype. The circuit simulation was performed with "PSpice," using a local oscillator frequency of 2 MHz and an audio/information signal frequency of 500 kHz. (Appx821-823.) The simulation was successful and motivated the creation of a physical prototype. (Appx823 ("This simulation shows that SSB do, in fact, appear, although there is quite a bit of spurious emission as well. It was also confirmed that no harmful signals appear near the target signal. So, let's make an actual circuit based on these results.").)

Nozawa's prototype used off-the-shelf components according to the design in Figure 8. (Appx823-829.) One such off-the-shelf component was

the “74HC4052” chip (also known as the “4052”), which included switches for up-converting the audio signal to a higher frequency for transmission. (Appx824.) The 4052 switch is highlighted below.

**Nozawa, Fig. 8 (annotations in petition at Appx109)**




Philips is the data sheet for the 74HC4052 and provides additional details regarding the structure and operation of the chip. (Appx831-845; *see also* Appx10; Appx12; Appx724; Appx731-732.) For example, Philips notes that the 4052’s switches perform “[s]ignal gating.” (Appx834.)

Nozawa includes tests of the prototype using a local oscillator frequency of 2.5 MHz and an audio signal frequencies of 0.8 kHz, 1.0 kHz, and 1.3 kHz. (Appx825-826.) The Nozawa prototype transmitted with “good sound quality.” (Appx828.)

Qualcomm’s petitions applied these teachings to the challenged claims.

Considering claim 21, for example, the 1828 petition addressed the "pulse shaping" limitation. (Appx102-108, Appx110-112; Appx733-739, ¶¶ 159-167.) Nozawa's design creates four rectangular-waveform oscillating signals used to control the switches, as depicted below in an annotated version of Philips Figure 4. (Appx102-108, Appx110-112.)

**Philips, Fig. 4 (annotations in petition at Appx112)**




For the "switch" limitations, the petition included a detailed discussion of the operation of the 4052 chip in Nozawa's design. (Appx108-119; Appx739-758, ¶¶ 169-197.) For example, the petition included the following figure, which shows a switch receiving an information signal (pink) and an oscillating signal (blue) and generating a periodic output signal (green).

**Philips, Fig. 4 (annotations in petition at Appx119)**




For the portion of the "switch" limitation requiring the device to "generate a periodic signal having a plurality of harmonics," the petition pointed to the green output noted above, which was combined and output as shown below. (Appx116 (citing Philips, Figures 4 and 5); Appx120 (annotating combined output on Nozawa, Fig. 8).) The petition noted that "Nozawa expressly recognizes that its use of switches to gate the incoming signals creates harmonics." (Appx 117.) In particular, "'because the method

used to realize this system is ‘switching,’’ it ‘in principle includes many harmonics.’” (Appx117 (quoting Appx824).) In other words, as a result of the principles discussed above for switches with on-and-off square-wave oscillating signals, the output of Nozawa would include “many harmonics.” (Appx824.)

The petition reinforced this point with Maas, a textbook entitled “Microwave Mixers.” (*E.g.*, Appx1706-1742.) The petition noted that “switches such as those in the 74HC4052 generate an output signal with harmonics of the fundamental frequency” and quoted Maas’s recognition that “‘[t]he use of a nonideal multiplier results in the generation of LO harmonics and in mixing products other than the desired one.’” (*E.g.*, Appx117 (quoting Appx1728).)

The petition quoted an equation from Maas, which shows how the harmonics of the oscillating signal interact with the information signal to create the mixing products. A portion of the petition quoting Maas’s equation is excerpted below:

| **Nozawa Petition (Appx117 (excerpt))** |
| --- |
| Maas further explains that output frequencies can be calculated using the relation: $$f_{IF} = mf_{RF} + nf_{LO}$$ where $$m, n = 0, \pm 1, \pm 2, \ldots$$ And $f_{IF}$, $f_{RF}$, and $f_{LO}$ are the IF, RF, and LO frequencies. (Ex. 1017, Maas at 30.) |

The term "n" refers to the harmonics of the local oscillator signal ($f_{LO}$), following the well-known integer-multiple format, *i.e.*, "n = ***0***, ±***1***, ±***2***..."[18] (Appx117 (emphasis added).) The equation also shows the sum-and-difference characteristics of the mixer outputs. (*Id.*) Specifically, for each harmonic of the local oscillator signal, a mixer may output two signals: (1) a signal consisting of the information signal ($f_{RF}$) plus the harmonic of the local oscillator signal ($+nf_{LO}$) and (2) a signal consisting of the information signal ($f_{RF}$) minus the harmonic of the local oscillator signal ($-nf_{LO}$). (*Id.*) As noted below, the Nozawa design suppressed some of the harmonics, such as the even-order harmonics, *i.e.*, n = 2, 4, 6, etc.

[18] As ParkerVision agrees, "[f]or a switch-based circuit such as Nozawa's, m=1." (Appx279.)

The declaration accompanying the petition also described the sum-and-difference mixer outputs. (Appx684-686, ¶¶ 69-72.) For example, the declaration noted that the sum-and-difference mixer outputs can be described as "$f_{carrier} + f_{signal}$" and "$f_{carrier} - f_{signal}$" and that, as a result of up-conversion, "we say that the voice signal has been *translated* to the carrier frequency." (*Id.*) The declaration likewise provided an equation equivalent to the Maas equation – "$nf_c \pm mf_s$" – where $f_c$ refers to the frequency of the carrier and $f_s$ refers to the frequency of the signal to be transmitted. (Appx696-698, ¶¶ 88-94.)

The petition then addressed the "filter" limitation in claim 21. (Appx119-122; Appx759-764, ¶¶ 199-208.) As shown in Nozawa Figure 8, the outputs of each switch are combined together and outputted to a low-pass filter used to isolate the desired transmission signal. (Appx119-120 (citing Appx824).) As quoted above, Nozawa expressly taught that "[t]he low-pass filter was needed because the method used to realize this system is 'switching,' which in principle includes many harmonics."[19] (Appx824.)

---

[19] The petition provided two alternative grounds for the filter limitation to address a dispute between the parties as to whether the fundamental frequency should be considered a "harmonic" of itself. (Appx120-122.)

**Nozawa, Fig. 8 (annotations in petition at Appx120)**




For each of the remaining challenged independent claims, the petitions conducted a substantially similar analysis. (Appx122-127; Appx5155-5172.) The petitions also addressed the challenged dependent claims. (Appx127-133; Appx5172-5184.)

### 2. The Board found the challenged apparatus claims unpatentable, but rejected the challenge to the method claims.

In its preliminary response, ParkerVision conceded that Qualcomm "has reconstructed Patent Owner's claimed invention," but argued that Qualcomm had done so "only with the benefit of hindsight." (Appx163-165; *id.* (arguing that Qualcomm's "proposed combination of Nozawa, Philips 4052 and Maas relies on impermissible hindsight that is a result of using the claimed invention as a blueprint").) ParkerVision also contended

that combining Nozawa and Philips, in light of the teachings from Maas, would "change the principle operation of Nozawa" and alleged that Qualcomm's arguments were "conclusory" for certain claim elements. (*E.g.*, Appx163; Appx179.)

The Board's institution decision rejected ParkerVision's arguments. (Appx192-221.) The Board's decision also addressed a claim construction dispute, concluding that the claim term "harmonics" included the fundamental frequency. (Appx203-206.) As a result, the challenged claims were not limited to subharmonic upconversion, but instead, covered devices, like Nozawa, which use oscillating signals with fundamental frequencies that are already at the high frequencies desired for transmission.

Following institution, ParkerVision changed course, abandoning its previous arguments in favor of a single failure-of-proof argument based on the term "plurality of harmonics." (Appx250-251.) The linchpin of ParkerVision's new argument was a calculation performed during the deposition of Qualcomm's expert, Dr. Larson. ParkerVision asked Dr. Larson "to calculate the frequency content" outputted by Nozawa, applying the "well-known formula for calculating" mixer outputs from Maas. (Appx278; Appx251.) The parties agreed that the harmonics of the

oscillating signal used in Nozawa's design followed a pattern such that the value of "n" in the Maas equation was equal to -1, 3, -5, etc. and that the value of "m" was equal to 1.[20] (Appx278-279.)

Applying the Maas equation to the Nozawa design and the specific frequencies ParkerVision provided (a 0.1 MHz input signal and a 1 MHz oscillator signal) resulted in the following calculations, as ParkerVision itself highlighted in its response: "[T]he frequency content of the combined output signal of the 4052 chip, i.e., the purported "periodic signal," would be ***0.9 MHz*** (the fundamental frequency), ***3.1 MHz, 4.9 MHz, 7.1 MHz, 8.9 MHz, 11.1 MHz, and so on*** …." (Appx280 (emphasis added).[21]) ParkerVision asserted that "only one [of the calculated frequencies] (0.9 MHz) is an integer multiple ('harmonic') of the purported periodic frequency (0.9 MHz)" and, therefore, Qualcomm could not show the "required 'periodic signal having a plurality of harmonics.'" (*Id*.)

---

[20] In more detail, the expert noted that "(1) Nozawa was a single sideband circuit and would therefore result in single alternating upper and lower single sidebands with a suppressed carrier, and (2) that there would be no frequencies present where n = an even number because the circuit would suppress those frequencies." (Appx279 (internal citation omitted).)

[21] For example, for n = 3, the calculation is $f_{IF}$ = (1)(0.1 MHz) + (3)(1 MHz) = 3.1 MHz. (Appx280.)

In its reply, Qualcomm showed that ParkerVision had prematurely jumped to the wrong conclusion by limiting its calculations to only the first few terms in the series. (Appx293; Appx297-298.) ParkerVision calculated the series as "0.9 MHz ... , 3.1 MHz, 4.9 MHz, 7.1 MHz, 8.9 MHz, 11.1 MHz, ***and so on*** …." (Appx280 (emphasis added).) As the series continued onward, according to ParkerVision, the outputs would "alternate between frequencies that are 0.1 MHz lower than, and frequencies that are 0.1 MHz higher than, the odd integer multiples of the LO." (*Id.*) Simply continuing ParkerVision's calculations yields output values of 35.1 MHz and 36.9 MHz, which are each integer multiples of the fundamental frequency of 0.9 MHz. Qualcomm's reply thus stated that, because these output signals "are integer multiples of the fundamental frequency of the mixer output," "the claimed 'plurality of harmonics' is present" under ParkerVision's own argument. (Appx298.)

Qualcomm's reply also showed that the legal ground of ParkerVision's argument rested on a misinterpretation of the invalidity standard. As Qualcomm noted: "It [was] not Petitioner's burden to show that Nozawa necessarily would generate the required 'integer multiple' harmonics under all operating conditions." (Appx295.) Instead, Qualcomm could show invalidity

by demonstrating that Nozawa would practice the challenged claims within the range of its operating conditions. (*Id.*) Indeed, the specific frequencies ParkerVision itself had used in the deposition and the briefing showed that Nozawa indisputably taught the claimed invention. (*Id.*)

The Board's Final Determinations addressed the sole dispute raised by ParkerVision. (Appx13 ("ParkerVision contests only one limitation: whether Qualcomm has proven that the combination discloses a 'plurality of harmonics.'").) The Board found that, "under some conditions, but not all conditions, the Maas equation shows that Nozawa's structure will produce a periodic signal that contains integer multiples of the fundamental frequency." (Appx17.) The Board also found that "it is undisputed that Nozawa's circuit is capable of generating a periodic signal having a plurality of harmonics, wherein those harmonics are integer multiples of the fundamental frequency." (*Id*.) Because "apparatus claims ... cover what a device is, not what a device does," the Board concluded that the challenged apparatus claims were unpatentable. (*Id.* (internal quotation omitted).) But the Board rejected the challenge to the method claims, concluding that "Qualcomm must show that a person of ordinary skill in the art would have performed the method as

claimed" and Qualcomm's petition had not provided sufficient evidence of that performance. (Appx18-20.)

Accordingly, in the 1828 and 1831 *inter partes* reviews, the Board found the challenged apparatus claims unpatentable but rejected the challenge to the method claims.

## III. SUMMARY OF THE ARGUMENT

### A. Krauss/Ariie *Inter Partes* Review

ParkerVision does not dispute that the combination of Krauss and Ariie teaches all elements of the claims at issue in this petition. Instead, ParkerVision stakes its appeal on a waiver argument that the Board squarely rejected.[22] ParkerVision argues that Qualcomm's petition failed to identify Krauss's rectangular waveforms (Signals "D" and "E") as teaching the claimed "first oscillating signal" and "second oscillating signal" that would be input to Ariie's FET mixer. The Board correctly rejected that

[22] On appeal, ParkerVision has dropped two of the three arguments it made to the Board in the Krauss/Ariie *inter partes* review. Specifically, ParkerVision has dropped its argument that Ariie by itself does not teach a "switch module" that "gates," which the Board rejected as irrelevant. ParkerVision has also dropped its argument that a person of ordinary skill would not have substituted Ariie's FET mixers in place of Krauss's double-balanced mixers, which the Board rejected as contradicted by the factual record. (*See supra* § II(B)(2).)

argument, finding that "the Petition specifically highlighted the 'First Oscillating Signal D' of Figure 16-3(c)—the rectangular wave—and states that gate G of Ariie's FET Q1 would receive that signal." (Appx36.) This Court should affirm the Board's finding.

ParkerVision also offers a new evidentiary argument that it did not raise below, contending that Qualcomm failed to provide evidence of a motivation to "modify Ariie's design by replacing the Ariie mixer's oscillating signal with the Krauss oscillating signal." (PV Br. 59.) ParkerVision's argument is waived and, in any event, gets the issue exactly backward. ParkerVision misconstrues the invalidity theory Qualcomm raised and the Board adopted, which started with Krauss, not Ariie, as the base reference for obviousness. Qualcomm's invalidity theory started with Krauss's Signals D and E and the circuitry for generating them, as well as Krauss's phase-splitting network, its summer, its filters, and its amplifiers. Krauss's double-balanced mixer was replaced with Ariie's FET mixer, as explained in Qualcomm's petition and the accompanying declaration submitted to the Board. Qualcomm provided abundant evidence showing a motivation to make that change, the Board agreed with Qualcomm's analysis and evidence, and ParkerVision never challenged that point. Accordingly, the Court should reject ParkerVision's new motivation-to-combine argument.

### B. Nozawa/Philips/Maas *Inter Partes* Reviews

The sole issue on appeal for the Nozawa IPRs is the obviousness of creating "integer multiple harmonics" using the mixer in Nozawa. On this issue, Qualcomm's petitions cited to (i) express evidence from Nozawa that Nozawa's switch-based mixer design will generate "harmonics," and (ii) Maas's undisputed equation showing when Nozawa's "harmonics" will have an integer-multiple relationship with each other.

During the IPRs, ParkerVision did not raise any meaningful dispute to the evidence cited in Qualcomm's petitions. To the contrary, ParkerVision acknowledged the applicability of Maas's equation and attempted to use the Maas equation to try and prove that the "harmonics" created by Nozawa's mixer would not have an integer multiple relationship. Rather than support its position, ParkerVision's calculations ended up supporting invalidity—providing further undisputed evidence that Nozawa's mixer will generate integer multiple harmonics when using frequencies within its operating range.

On appeal, ParkerVision ignores the undisputed evidence and instead tries to frame the appeal as a legal issue. But ParkerVision's legal arguments cannot escape the undisputed evidence raised in Qualcomm's petitions and confirmed in ParkerVision's responses.

# IV. ARGUMENT

## A. Standard of Review

This Court reviews factual findings by the Board for substantial evidence. *E.g.*, *Sanofi-Aventis v. Pfizer*, 733 F.3d 1364, 1366 (Fed. Cir. 2013); *In re NTP*, 654 F.3d 1279, 1292-93 (Fed. Cir. 2011) ("This court does not reweigh evidence on appeal, but rather determines whether substantial evidence supports the Board's fact findings."); *Belden v. Berk-Tek*, 805 F.3d 1064, 1073-74 (Fed. Cir. 2015) (affirming Board's obviousness determination); *VirnetX v. Apple*, 665 F. App'x 880, 889 (Fed. Cir. 2016) (patent owner's arguments did not demonstrate a "lack of substantial evidence in support of the PTAB's obviousness findings"). Under this standard, "[t]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *In re Applied Materials*, 692 F.3d 1289, 1294 (Fed. Cir. 2012).

The ultimate determination of obviousness is a question of law reviewed *de novo*, but any factual findings associated with an obviousness determination are reviewed for substantial evidence. *In re Applied Materials*, 692 F.3d at 1294; *In re Cuozzo Speed Techs.*, 793 F.3d 1268, 1280 (Fed.

Cir. 2015) ("What a reference teaches and the differences between the claimed invention and the prior art are questions of fact which we review for substantial evidence.").

### B. Krauss/Ariie *Inter Partes* Review – ParkerVision's Appeal

#### 1. The Board properly rejected ParkerVision's waiver argument.

Unable to dispute the merits, ParkerVision tries to manufacture a waiver argument. ParkerVision argues that Qualcomm's petition failed to identify Krauss's rectangular Signals D and E as the "first oscillating signal" and "second oscillating signal" that would be applied to Ariie's FET mixer. (PV Br. 49-51.) The Board correctly rejected ParkerVision's argument.

The Board "evaluated ParkerVision's position and disagree[d] that Qualcomm raised the argument for the first time in its Reply." (Appx36 at n.5.) The Board unequivocally stated: "the Petition specifically highlighted the 'First Oscillating Signal D' of Figure 16-3(c)—the rectangular wave—and states that gate G of Ariie's FET Q1 would receive that signal." (Appx36 at n.5 (citing Appx2992, Appx2994).)[23]

---

[23] *See also* Appx2998 and Apppx3003 (providing annotated figures and discussing confirming that "Signal E" from Krauss is the "second oscillating signal").

The Board's finding is supported by a wealth of evidence. The petition and corresponding declaration cited by the petition each includes an annotated figure expressly mapping Signals D and E onto the first and second oscillating signal limitations. For example, with respect to claim Element [1a] the petition provides two "annotated figures indicat[ing] how the combination of Krauss and Ariie meets Element [1a]."[24] (Appx2992.)

The first annotated figure is reproduced below. It combines two figures from Krauss, showing both the block diagram of the overall architecture and the rectangular waveform of Signal D. (Appx2992 (combining Appx3724, Figs. 16-3(a) and 16-3(c)).) The annotated figure expressly equates the rectangular waveform of Signal D with the claimed "first oscillating signal," annotating the rectangular waveform in yellow as "First Oscillating Signal D." (Appx2992.) The annotated figure also depicts the signal path in yellow, showing Signal D going from the divider circuitry to Krauss's "First Mixer," indicated by a circle surrounding an X. (*Id.*) "First Mixer" is

[24] "Element [1a]" refers to the limitation reciting "a first switch module that receives a first oscillating signal and a first bias signal, wherein said first oscillating signal causes said first switch module to gate said first bias signal and thereby generate a first periodic signal having a first plurality of harmonics, said first periodic signal having an amplitude that is a function of said first bias signal." (Appx2991.)

not a claim term; instead, the petition uses that term to refer to circuitry in Krauss that will be replaced by circuitry in Ariie. Specifically, the petition proposes a combination in which "each double-balanced mixer in Krauss Fig. 16-3(a) is replaced by a mixer such as that in Fig. 1 of Ariie." (Appx2993.)

**Annotated Version of Krauss Figs. 16-3(a) and (c) from Qualcomm's Petition (Appx2992 (annotations in original))**




The second annotated figure, reproduced below, shows the continuation of the yellow "First Oscillating Signal" path into Ariie's FET mixer. The first oscillating signal generated by Krauss is inputted into this circuit via $I_2$, the "signal input terminal." (Appx3725 (col. 4:49-51).) The first oscillating signal then travels via the yellow-highlighted line from $I_2$ to Gate G of Ariie's FET. Notably, although Ariie renames the signal it received via $I_2$ as carrier signal "$S_c$," Ariie Figure 1 does not include any circuitry it could have used to

generate its own independent oscillating signal. For example, Ariie Figure 1 does not include the variable frequency oscillator (VFO) and divider circuitry that Krauss uses to produce the rectangular wave oscillating signals or any equivalent circuitry.

**Annotated Version of Ariie Fig. 1 from Qualcomm's Petition (Appx2993 (annotations in original))**




In the text accompanying the annotated figures, the petition reiterates that Krauss discloses the "first oscillating signal," stating that "[t]he top mixer in Krauss Fig. 16-3(a) receives first oscillating signal 'D' at carrier frequency $f_o$." (Appx2994.) Ignoring the rest of the disclosures in Qualcomm's petition, ParkerVision latches onto the "top mixer" language from that quotation. ParkerVision argues that this "passage merely asserts that Krauss generally

describes that the Krauss mixer, not the Ariie mixer, will receive the Krauss oscillating signal D: "The top mixer in Krauss Fig. 16-3(a) receives first oscillating signal 'D.'" (PV Br. 50 (emphasis omitted).)

ParkerVision's argument fundamentally misconstrues the disclosures in Qualcomm's petition. Most critically, ParkerVision's argument fails because it ignores the fact that, in the proposed combination, Ariie's FET becomes the top mixer in Krauss Fig. 16-3(a):

> **Petition**: "[I]t would have been obvious to a POSA to substitute a mixer like that in Ariie Fig. 1 for each double-balanced mixer in Krauss Fig. 16-3(a)." (Appx2994.)
>
> **Corresponding declaration**: "[I]t would have been obvious, in my opinion, for a POSA to substitute the simple-switch, single-FET mixer in Ariie for the top double-balanced mixer in Krauss, Fig. 16-3(a)." (Appx3576.)
>
> **Institution Decision**: "Petitioner asserts that modifying the circuit in Krauss Figure 16-3(a) to replace each double-balanced mixer with the mixer of Ariie results in a device that contains every structural component recited in claim 1."). [25] (Appx3089.)

[25] *See also, e.g.*, Appx2993 ("In the proposed combination, each double-balanced mixer in Krauss Fig. 16-3(a) is replaced by a mixer such as that in Fig. 1 of Ariie ...."); Appx2994 (citing, *e.g.*, Appx3569 ("In my opinion, it would have been obvious for a POSA, guided by the teachings in Ariie, to substitute a mixer such as the simple-switch, single-FET mixer disclosed in

Thus, the yellow oscillating signal generated in Krauss's variable frequency oscillator and divider circuitry, Signal D, does not stop when it reaches the "top mixer" in Krauss. Instead, because the circuitry in Ariie Figure 1 is used in place of the double-balanced mixer (the component indicated by a circle surrounding an X), Signal D continues on through Ariie's signal input terminal, $I_2$, and proceeds to Gate G of Ariie's FET. The Board found: "[T]he Petition specifically highlighted the 'First Oscillating Signal D' of Figure 16-3(c)—the rectangular wave—and states that gate G of Ariie's FET Q1 would receive that signal." (Appx36 n.5.)

ParkerVision's interpretation of Qualcomm's petition is not only mistaken, but nonsensical. If Qualcomm had intended to limit its invalidity argument to a signal in Ariie itself, it would have had no reason to depict and discuss Signals D and E, to annotate Figure 16-3(a) with the rectangular waveforms of Signals D and E, or to expressly tie Signals D and E to the "first oscillator signal" and "second oscillator signal" claim language.

---

Ariie for the first (top) double-balanced mixer in Krauss, Fig. 16-3(a), identified above.")); Appx2997 ("Recall also that, in the proposed combination, each double-balanced mixer in Krauss Fig. 16-3(a) is replaced by a mixer such as that in Ariie Fig. 1."); Appx3005-3006 ("[I]n the proposed combination, each double-balanced mixer in Krauss Fig. 16-3(a) is replaced by a mixer such as that in Ariie Fig. 1.").

Moreover, nothing in Qualcomm's petition suggests that the combination of Krauss and Ariie would eliminate the variable frequency oscillator and digital frequency divider circuitry from Krauss for generating oscillating Signals D and E. To the contrary, Ariie Figure 1 could not contribute that part of the combination, because it does not include any circuitry for generating an oscillating signal. Instead, Ariie Figure 1 depicts only an input showing where an oscillating signal generated elsewhere would be connected to Ariie's FET.

ParkerVision also ignores the remainder of the petition and corresponding declaration. For the "gates" limitation, the petition explained that a person of ordinary skill in the art would understand that using the rectangular wave signals provided by Krauss results in "gating." (Appx2994-2995.) For example, the petition depicted and expressly relied on rectangular "gating pulses" from Krauss Figure 8-25(b). (Appx2995 ("Krauss discusses the concept of 'gating' an audio signal in combination with a DC bias signal ...."); *id.* ("note the 'gating pulses' b").

**Krauss Fig. 8-25(b) from Qualcomm's Petition (Appx2995)**



ParkerVision likewise ignores the disclosures for dependent claim 2 that specifically identified Krauss's rectangular wave Signals D and E as the claimed "first oscillating signal" and "second oscillating signal." (Appx3003.) The petition includes an annotated figure that, once again, identifies Signal D as "First Oscillating Signal D" and Signal E as "Second Oscillating Signal E" and depicts their rectangular shape:

**Annotated Version of Krauss Figs. 16-3(a) and (c) from Qualcomm's Petition (Appx3003 (annotation in original))**




The text in the petition and corresponding declaration also expressly tie Signals D and E to the claimed first and second oscillating signals. For example, the declaration refers to "[t]he embodiment in Krauss discussed above in connection with claim 1," and equates "the oscillating signal corresponding to the recited 'first oscillating signal'" with "the signal 'D' in

Fig. 16-3(a)," and equates "the oscillating signal corresponding to the recited 'second oscillating signal'" with "the signal 'E' in Fig. 16-3(a)":

> 212. Claim 2 recites, "The apparatus of claim 1, wherein said first oscillating signal and said second oscillating signal have substantially the same frequency and are out of phase with each other by substantially 90°." ***The embodiment in Krauss discussed above in connection with claim 1***, the direct-conversion SSB transmitter shown in Fig. 16-3(a), discloses this limitation. Krauss expressly discloses that ***the oscillating signal corresponding to the recited "first oscillating signal" (the signal "D" in Fig. 16-3(a))*** and ***the oscillating signal corresponding to the recited "second oscillating signal" (the signal "E" in Fig. 16-3(a))*** are out of phase with respect to each other by 90°: "[oscillating signals] D and E, which are of frequency $f_o$ [the carrier frequency][,] . . . differ in phase by 90°." (Ex. 1003 at 79, Fig. 16-3(a).)

(Appx3604-3605 (emphasis added); *see also* Appx3003 ("[T]he signals corresponding to the recited first and second oscillating signals are out of phase with respect to each other by 90°: "[oscillating signals] D and E, which are of frequency $f_o$ [the carrier frequency][,] ... differ in phase by 90°.").)

As an independent ground, the Board also properly held that the combination of Krauss and Ariie invalidates the challenged claims based on the undisputed fact that Ariie's FET is capable of being used as a "switch" "to gate." (Appx38 ("The record is clear, and ParkerVision does not deny, that

Ariie's FET is capable of being used as a 'switch module' that 'gates,' if it is driven with the proper input. This is sufficient to satisfy the limitations.").) As Qualcomm's proposed combination demonstrates, using the rectangular-waveform oscillating signal from Krauss to drive Ariie's FET teaches a "switch module" that "gates."

In sum, the Board correctly recognized that Qualcomm's theory has been the same since the outset. Having a full and fair opportunity to respond to this theory, ParkerVision did not dispute that the proposed combination teaches each of the claim elements but instead relied on a fatally flawed procedural waiver argument. *Belden v. Berk-Tek*, 805 F.3d 1064, 1080 (Fed. Cir. 2015) (explaining that this Court determines "whether the Board relied on a 'new ground of rejection' by asking 'whether applicants have had fair opportunity to react to the thrust of the rejection.'") (internal citation omitted). Qualcomm's petition identified Krauss's rectangular Signals D and E as the "first oscillating signal" and "second oscillating signal," and contrary to ParkerVision's new claim construction argument on appeal, the Board did not read out the switch and gate limitations of the claims, finding instead that Ariie's FET could be used as a "switch" that gates. Accordingly, the Court should affirm the Board's finding of unpatentability.

### 2. The Court should reject ParkerVision's new motivation-to-combine argument.

On appeal, ParkerVision also raises a new argument that Qualcomm allegedly failed to provide a motivation for modifying the Ariie mixer design to use the rectangular wave oscillating signal from Krauss. (PV Br. 58-60.) ParkerVision's argument is misleading and incorrect.

ParkerVision mischaracterizes Qualcomm's petition, stating: "Qualcomm argument [is] that it would have been obvious to replace the Ariie mixer's oscillating signal with the Krauss oscillating signal to cause the Ariie FET to gate a signal as required by the challenged claims." (PV Br. at 58.) This mischaracterization ignores the actual obviousness argument in Qualcomm's petition.

Qualcomm's petition argued that it would have been obvious to substitute Ariie's mixer in place of the double-balanced mixers in Krauss Fig. 16-3(a). (Appx2989-2990.) Krauss Fig. 16-3(a) already included all the necessary circuitry for the remaining claim limitations, including (a) a phase splitting network to produce the two audio signals provided to each mixer, (b) the variable frequency oscillator and digital frequency dividers for producing the rectangular wave oscillating signals provided to each mixer, (c) the summer that sums the outputs of the mixers, and (d) the low-pass filter for

processing the output of the summer. (Appx3661 (Krauss) at Appx3724 (Fig. 16-3(a)) and Appx3725 (description).) Qualcomm's obviousness argument did not suggest changing any of those components. The sole modification Qualcomm proposed was to replace the double-balanced mixers in Krauss Fig. 16-3(a) with the mixer in Ariie Fig. 1. (Appx2960 at Appx2989-2990.)

This proposed modification did not require any modification to Ariie. Indeed, Ariie Fig. 1 does not include any specific oscillating signal, or any circuitry to generate an oscillating signal, that would need to be changed. Instead, Ariie Fig. 1 only shows the signal path along which an oscillating signal—any oscillating signal—could be provided to the gate of the Ariie FET. (Appx3727.) When Ariie Fig. 1 is substituted for the double-balanced mixers in Krauss Fig. 16-3(a), the oscillating signal is produced by the circuitry already present in Krauss Fig. 16-3(a)—the variable frequency oscillator and digital frequency dividers that create the rectangular wave Signals D and E:

| **Annotated Versions of Krauss Figs. 16-3(a) and (c) and Ariie Figure 1 from Qualcomm's Petition (Appx2992-2993 (annotations in original))** |
| --- |




As Qualcomm's petition explained, Ariie itself provides an express motivation for Qualcomm's proposed combination. (Appx2989.) Indeed, it is undisputed that (i) Krauss Fig. 16-3(a) provides the architecture of an orthogonal modulator, and (ii) that Ariie expressly teaches that one of the purposes of the Ariie's mixer is to be used in an orthogonal modulator. (Appx3726 (Ariie) ("The present invention relates to mixers used for

modulators such as orthogonal modulators...”).) This express motivation to use Ariie Fig 1. in Krauss Fig. 16-3(a) is more than sufficient to establish the obviousness of the combination. *Outdry Techs. v. Geox S.p.A.*, 859 F.3d 1364, 1370-71 (Fed. Cir. 2017) (“Any motivation to combine references, whether articulated in the references themselves or supported by evidence of the knowledge of a skilled artisan, is sufficient to combine those references.”).

During the proceedings, ParkerVision had a full opportunity to raise its arguments as to why a person of skill in the art would not combine Krauss and Ariie. After considering ParkerVision’s arguments, the Board issued a Final Written Decision, detailing an evidenced-based explanation in support of its finding that there would have been a motivation to combine Krauss and Ariie. ParkerVision provides no basis for setting aside the Board’s findings. *Outdry*, 859 F.3d at 1369-71.

### C. Nozawa/Philips/Maas *Inter Partes* Reviews

#### 1. Apparatus Claims – ParkerVision's Appeal – The Board correctly found the challenged apparatus claims unpatentable.

##### a. Qualcomm's petition showed that Nozawa and Philips taught the challenged claims, as ParkerVision's own calculations demonstrated.

ParkerVision focuses its appeal on the incorrect assertion that Qualcomm presented an untimely invalidity theory. To the contrary, Qualcomm's petitions showed that the transmitter design in Nozawa and Philips taught the challenged claims. Nozawa and Philips disclose a transmitter and receiver design that was intended to be operated over a wide range of frequencies. (*E.g.*, Appx823 (Nozawa simulation with information signal frequency of 500 kHz and oscillating signal frequency of 2 MHz); Appx825-826 (Nozawa prototype testing with information signal frequencies of 0.8 kHz, 1.0, kHz, and 1.3 kHz); Appx824 (providing additional components "to be able to work with LO signals that have higher frequencies"); *Id.* (noting need for a "switching speed fast enough to work with the frequencies being used").)

In its petitions, Qualcomm provided detailed disclosures of the operation of Nozawa and Philips, showing that the design created a rectangular-waveform oscillating signal. (*E.g.*, Appx102-108.)

The rectangular-wave oscillating signal was used to control switches that up-converted the input signal—an audio signal—from a low frequency to a high frequency. (*E.g.*, Appx108-119.) The outputs of the switches in Nozawa and Philips were filtered and then used to transmit the audio information wirelessly. (*E.g.*, Appx119-122.)

On the sole term disputed by ParkerVision, "plurality of harmonics," Qualcomm provided substantial evidence showing that Nozawa's operation satisfies the claim. Qualcomm first relied on Nozawa's express recognition that—as a result of the centuries-old principles of physics and mathematics that are also discussed in the '940 patent—Nozawa's switches will output "many harmonics." (*E.g.*, Appx115-117.) In an attempt to diminish this teaching, ParkerVision's appeal brief purports to draw a distinction between "'integer multiple' harmonics" and "harmonics." (*E.g.*, PV Br. 21-22, 45-46.) But ParkerVision's alleged distinction is illusory and misplaced, because harmonics are, by definition, integer multiples of the fundamental frequency, as the parties and the Board all recognized below.[26] Accordingly, nothing

[26] *See, e.g.*, Appx605, col. 8:22-30; Appx7; Appx272 (ParkerVision: relying on dictionary definition of "harmonic" as "a component whose frequency is a whole-number multiple of the fundamental frequency") (quoting Appx2941); Appx94-95 (Qualcomm: relying on dictionary definition of "harmonic" as "'a

supports the argument that Nozawa used "harmonic" in a manner different from the definition of "harmonic" in the '940 patent.

Qualcomm also provided teachings from Maas, along with the Maas equation itself. (*E.g.*, Appx117-118.) The Maas equation governs the frequencies of the mixer outputs for the design in Nozawa and Philips. (*E.g.*, Appx117-118; Appx125.) The Maas equation provides a clear mathematical demonstration of when the Nozawa mixer outputs will have an integer-multiple relationship with each other. (Appx131-132 ("Maas teaches that, as a matter of physics, harmonics of the fundamental frequency of the periodic signal are present in the mixer output.").)

Before the Board, ParkerVision did not dispute that the Maas equation dictated the frequencies of the Nozawa mixer outputs or assert that it lacked adequate notice of how the Maas equation applied to the Nozawa mixer. To the contrary, ParkerVision emphasized the use of the Maas equation in its arguments against Qualcomm's invalidity challenge. ParkerVision conceded that, "at the deposition of Qualcomm's expert, Dr. Larson, he calculated the frequency content of the purported Nozawa/Philips 'periodic signal.'"

---

multiple of the fundamental frequency by a whole-number factor of 2 or more'") (quoting Appx2114).

(Appx250-251; Appx278 (expert "was asked to calculate the frequency content of the combined output signal of the 4052 chip").) ParkerVision also conceded that Dr. Larson "used the following well-known formula for calculating Intermediate Frequencies generated by a mixer," quoting the Maas equation, as below. (*Id.*) ParkerVision further admitted that Qualcomm had identified this equation in its petition "for calculating whether a mixer's output signal includes 'harmonics.'" (Appx278-279.)

| **ParkerVision's Patent Owner Response (Appx278-279)** |
| --- |
| He used the following well-known formula for calculating Intermediate Frequencies generated by a mixer, identified by Qualcomm for calculating whether a mixer's output signal includes "harmonics": $$f_{IF}=mf_{RF} + nf_{LO}$$ where $$m, n = 0, \pm 1, \pm 2, \ldots$$ (*E.g.*, Petition at 37; Petition Ex. 1017 at Maas page 180; Patent Owner Ex. 2001, Larson Deposition at 176:10-19, 178:24-179:3, 181:13-17). In this formula, |

ParkerVision then described the results of the calculation:

> Thus, the frequency content of the combined output signal of the 4052 chip, i.e., the purported "periodic signal," would be 0.9 MHz (the fundamental frequency), 3.1 MHz, 4.9 MHz, 7.1 MHz, 8.9 MHz, 11.1 MHz, and so on, continuing [to] alternate between frequencies that are 0.1 MHz lower than,

> and frequencies that are 0.1 MHz higher than, the odd integer multiples of the LO.

(Appx280.) Stated another way, ParkerVision recognized that the "odd integer multiples of the LO" were 1, 3, 5, 7, 9, 11, and so on (all in MHz), and the outputs from the switches alternated between just below and just above that series of numbers. (*Id.*) For example, the first output in the series (0.9 MHz) is just below 1 MHz, the second output in the series (3.1 MHz) is just above 3 MHz, and so on.

ParkerVision then declared victory based on that calculation, asserting that the calculated frequency content did not include any integer multiples:

> Critically, none of those calculated frequencies is an integer multiple ("harmonic") of the LO signal. In addition, only one (0.9 MHz) is an integer multiple ("harmonic") of the fundamental frequency of the purported periodic signal (0.9 MHz). This purported "periodic signal" thus does not have a "plurality of harmonics" ....

(*Id.*; Appx250-251 (arguing that Qualcomm's petition "should be rejected in its entirety" based on the calculation).) Unpacking ParkerVision's argument, it identified the lowest mixer output frequency as 0.9 MHz, calling it the "fundamental frequency." (Appx280.) ParkerVision then excluded any frequencies in the series that were not integer multiples of 0.9 MHz. As an example, according to ParkerVision, the second term in the series (3.1 MHz)

did not count as a "harmonic" because its frequency (3.1 MHz) was not an integer multiple of the first term in its series (0.9 MHz).[27]

ParkerVision declared victory much too soon, apparently failing to recognize that its calculations, in fact, showed invalidity. ParkerVision conceded in its argument that the series of signals output from the Nozawa switches did not stop when they reach 11.1 MHz, but instead "continu[ed] [to] alternate between frequencies that are 0.1 MHz lower than, and frequencies that are 0.1 MHz higher than, the odd integer multiples of the LO." (*Id*.) Expanding the series calculated by ParkerVision for several more values leads to the mathematically inescapable conclusion that the series ParkerVision calculated does, in fact, include a "plurality of harmonics."

In particular, ParkerVision expressly calculated the following values: 0.9, 3.1, 4.9, 7.1, 8.9, 11.1 (in MHz), and then indicated with "and so on" that the series would continue. (Appx280.) Expanding that series further yields: 12.9, 15.1, 16.9, 19.1, 20.9, 23.1, 24.9, 27.1, 28.9, 31.1, 32.9, 35.1, 36.9, and so on (in MHz). (*See* Appx297-298.) The two underlined frequencies listed

[27] 3.1 MHz / 0.9 MHz = 3.444..., which is not an integer.

above—35.1 MHz and 36.9 MHz—are each integer multiples of 0.9 MHz.[28] Accordingly, the series that ParkerVision itself emphasized includes a "plurality of harmonics" at 0.9 MHz, 35.1 MHz, and 36.9 MHz (and additional higher-order harmonics).[29]

ParkerVision's own admissions showed invalidity, and the Board found that "the Maas equation shows that Nozawa's structure will produce a periodic signal that contains integer multiples of the fundamental frequency" for at least some operating conditions. (Appx17.) Under governing law, "a prior art product that sometimes, but not always, embodies a claimed method nonetheless teaches that aspect of the invention." *Hewlett-Packard v. Mustek Sys.*, 340 F.3d 1314, 1326 (Fed. Cir. 2003); *Unwired Planet v. Google*, 841 F.3d 995, 1002 (Fed. Cir. 2016) ("It does not matter that the use of alphabetical order for locations would not always result in farther-over-nearer ordering. It is enough that the combination would sometimes perform all the method steps, including farther-over-nearer ordering."). Accordingly, the fact

---

[28] 35.1 MHz / 0.9 MHz = 39, and 36.9 MHz / 0.9 MHz = 41. (Appx297-298.) These output frequencies occur at n = 35 and n = 37. (*Id*.)

[29] The existence of either the 35.1 MHz or 36.9 MHz signal would have been enough under the Board's construction, which includes the "fundamental frequency" itself (here, 0.9 MHz) as one of the plurality of harmonics.

that the Maas equation shows that the Nozawa design will produce integer multiples, as ParkerVision's own calculations demonstrated unequivocally, is enough to show anticipation.

ParkerVision's appeal brief does not try to rebut these undisputed facts that played a key role in the Board's decision below. ParkerVision does not mention the Maas equation at all in its brief. ParkerVision also tries to retreat from its previous admissions, seeking to ignore its own calculation and argument that it made to the Board. Instead, ParkerVision's appeal brief raises the legal arguments addressed in the following section, none of which save its claims.[30]

#### b. The Board's decision did not rely on an untimely claim construction.

With no way to undo or explain away its concessions to the Board, ParkerVision attempts on appeal to characterize the issue as one of claim construction. ParkerVision argues that the Board adopted a "capable of" construction that (1) read out the "plurality of harmonics" term and (2) failed

[30] In addition to being factually mistaken, ParkerVision's argument was also flawed as a legal matter. As the *Hewlett-Packard* and *Unwired Planet* cases recognize, merely showing a single operating condition that did not meet the claims would not have been enough to counter Qualcomm's evidence of invalidity.

to provide ParkerVision fair and adequate notice. (PV Br. 40-41.)

First, neither the Board nor Qualcomm read out the plurality-of-harmonics term. Neither suggested that Nozawa would need to be modified to practice the plurality-of-harmonics term. Instead, the Board used the term "capable of" to refer to the undisputed fact that Nozawa teaches a flexible transmitter design that can be used across a range of frequencies in accordance with the well-known Maas equation. In other words, the Maas equation governs when the operating conditions will produce a plurality of harmonics, and ParkerVision itself admitted that some of those conditions result in a plurality of harmonics.

As described above, those facts suffice under governing law to show invalidity. *Hewlett-Packard*, 340 F.3d at 1326; *Unwired Planet*, 841 F.3d at 1002. Furthermore, "[i]t is well settled that patentability of apparatus claims must depend upon structural limitations and not upon statements of function." *Application of Michlin*, 256 F.2d 317, 320 (C.C.P.A. 1958); *Cisco Sys. v. Lee*, 557 F. App'x 963, 970 (Fed. Cir. 2014) (citing *Hewlett-Packard v. Bausch & Lomb*, 909 F.2d 1464, 1468 (Fed. Cir. 1990)). ParkerVision's reliance on *In re NuVasive* is unavailing. *In re NuVasive*, 841 F.3d 966, 972 (Fed. Cir. 2016). There, the Board relied upon a specific figure that was distinct from

the arguments in the petition. *Id.* at 970, 972. Here, the Board did not rely upon a new figure in Nozawa, but instead relied upon the Maas equation and the frequencies ParkerVision itself raised in its response.

Second, ParkerVision does not have a credible claim to being unfairly surprised by the result below. Although ParkerVision does not mention the Maas equation in its appeal briefing, ParkerVision conceded at the Board level that Qualcomm included the Maas equation in its petition "for calculating whether a mixer's output signal includes 'harmonics.'" (Appx278-279.) Indeed, ParkerVision itself relied on the Maas equation in trying to attack Qualcomm's proof of invalidity, as detailed above, characterizing it as a "well-known formula for calculating Intermediate Frequencies generated by a mixer." (Appx278.)

The fact that ParkerVision had not initially realized the impact of its calculations—*i.e.*, that its own Maas-based calculations showed Nozawa outputting a plurality of harmonics—does not mean that ParkerVision was unfairly surprised. *Genzyme Therapeutic Prod. v. Biomarin Pharm.*, 825 F.3d 1360, 1367 (Fed. Cir. 2016) (finding no due process violation where the patent owner could not "plausibly argue" that it lacked notice of two references, since the patent owner itself had raised the issues in its responses).

To the contrary, those calculations only further emphasize the unpatentability of the challenged claims.

Nor was it improper for Qualcomm to rely on the Maas equation to prove invalidity. *Purdue Pharm. Prods. L.P. v. Actavis Elizabeth*, 627 Fed. Appx. 931 (Fed. Cir. 2016), *affirming Purdue Pharm. Prods. L.P. v. Actavis Elizabeth*, No. 12-5311, 2015 WL 5032650, at *7, *33-34 (D.N.J. Aug. 25, 2015) (relying on Henderson-Hasselbalch equation for obviousness). Trying to provide an exhaustive list of all the conditions under which the Nozawa mixer would output the claimed "plurality of harmonics" would have been unworkable. As the Maas equation shows, even small differences in information or oscillator-signal frequencies can change whether the claimed "plurality of harmonics" would result. For example, Nozawa's simulation example uses a 500 kHz information signal and a 2 MHz oscillating signal. Applying the Maas equation, those signal values result in a plurality of harmonics. The first three "harmonics" are at 1.5 MHz, 22.5 MHz, and 25.5 MHz, which correspond to n = 1, 11, and 13.[31]

[31] According to the Maas equation as applied by ParkerVision, the first three harmonics are calculated as follows: 1.5 MHz = 1 * 2 MHz - 0.5 MHz; 22.5 MHz = 11 * 2 MHz + 0.5 MHz; 25.5 MHz = 13 * 2 MHz - 0.5 MHz.

Even slightly changing that example such that the information signal is at 501 kHz instead of 500 kHz would change the outcome for ParkerVision's claims. Applying the Maas equation, those signal values do not result in a plurality of harmonics at any n-value that could be measured by a transmitter. Instead, other than the fundamental frequency itself, the first n-value that would count for ParkerVision's claims as a "harmonic" does not occur until n = 5,995.[32] The patent recognizes that n values as high as 50 may be used.[33] But as ParkerVision's expert recognized, an n-value in the thousands is so high that it could never be measured in a transmitter.[34] In any event, walking through each possible pair of input frequencies in this way was not required to

[32] For those operating conditions, the fundamental frequency is 1.499 MHz. (1 * 0.501 MHz - 1 * 2 MHz.) The frequency where n = 5,995 is 11,990.501 MHz. (1 * 0.501 MHz + 5,995 * 2 MHz.) Those frequencies are integer multiples. (11,990.501 / 1.499 MHz = 7,999.)

[33] *E.g.*, Appx634, col. 66:19-24 (noting the use of the "50th subharmonic"); Appx595, Fig. 60 (providing harmonic values up to n = 50); Appx625, col. 47:26-29 ("[I]f the frequency of the oscillating signal is relatively low compared to the desired output frequency of the up-converter, a high harmonic will be needed.").

[34] Appx2260, at 69:13-70:5 ("I think for practical circuits, the M and N values never go to infinity. Reasonably they might go up to, you know, 20, 30, maybe a hundred, and at that point the parasitic capacitance and whatnot will attenuate any other multiples to, to very low levels which are basically undetectable.").

prove invalidity. Instead, Qualcomm properly relied on the Maas equation itself.

In sum, as the Board recognized, Qualcomm's petition showed that Nozawa taught each of the claim limitations, including the "plurality of harmonics" term. Accordingly, this Court should affirm the Board's finding that the apparatus claims challenged in the 1828 and 1831 *inter partes* reviews are unpatentable.

**2. Method Claims – Qualcomm's Cross-Appeal – The Court should also find the challenged method claims unpatentable.**

Although the Board correctly held that Qualcomm's petition showed unpatentability for the challenged apparatus claims, it incorrectly held that Qualcomm had not shown unpatentability for the method claims. The challenged apparatus and method claims recite essentially the same limitations, and Qualcomm used essentially the same evidence for both the apparatus and method claims. Nevertheless, for the method claims, the Board concluded that Qualcomm was required to "show that a person of ordinary skill in the art *would* have performed the method as claimed." (Appx18 (emphasis in original).) Because the Board found that Qualcomm's petition had not provided sufficient evidence of that performance, it rejected Qualcomm's challenge for the method claims.

The Board erred in its determination, because Qualcomm was not required to show performance of the method claim. *Kennametal v. Ingersoll Cutting Tool*, 780 F.3d 1376, 1383 (Fed. Cir. 2015) ("Though it is true that there is no evidence in Grab of 'actual performance' of combining the ruthenium binder and PVD coatings, this is not required."); *Bristol-Myers Squibb v. Ben Venue Labs.*, 246 F.3d 1368, 1379 (Fed. Cir. 2001) ("[A]nticipation does not require actual performance of suggestions in a disclosure."); *SRAM v. AD-II Eng'g*, 367 F. App'x 150, 157 (Fed. Cir. 2010) ("The question, however, is not whether the inventor built or could have built an operative model of the device, but whether the reference discloses each of the steps of the claimed method."). Here, applying the Maas equation to the design in Nozawa and Philips was sufficient to show invalidity for both the apparatus and the method claims.

Moreover, the Board erred in characterizing certain arguments from Qualcomm's reply as "late-arising." (Appx21.) Qualcomm's petition consistently argued that a person of ordinary skill in the art would have operated Nozawa in a manner to generate the claimed plurality of harmonics. (*E.g.*, Appx132 ("[A] POSA would consider it obvious to operate Nozawa's mixer at frequencies that would generate harmonics of the fundamental frequency of the periodic signal."); Appx131 ("A POSA, however, would

understand that Nozawa generates harmonics that are harmonics of the fundamental frequency of the periodic signal."); Appx121 ("the difference between selecting the fundamental frequency (n = 1) and a harmonic (n > 1) would have been obvious to a person of skill"); Appx789 (Qualcomm's expert explaining that the claimed '940 limitation was "obvious because a POSA would have known you could select a harmonic (n=2, 3, 4, etc.) for transmission").

Qualcomm's reply brief simply emphasized the same theory, adding arguments based on the application of the Maas equation that ParkerVision emphasized in its response. *Idemitsu Kosan v. SFC*, 870 F.3d 1376, 1381 (Fed. Cir. 2017) ("This back-and-forth shows that what Idemitsu characterizes as an argument raised 'too late' is simply the by-product of one party necessarily getting the last word."); *Genzyme Therapeutic Prods. v. Biomarin Pharm.*, 825 F.3d 1360, 1366-67 (Fed. Cir. 2016). Nothing about Qualcomm's reply was improper.

In sum, the Board applied an incorrect legal standard to reject Qualcomm's challenge to the method claims, and the same facts show invalidity for both the apparatus and method claims. Accordingly, this Court should reverse the Board's rejection of Qualcomm's challenge to the method claims in the 1828 *inter partes* review proceedings.

## V. CONCLUSION AND STATEMENT OF RELIEF SOUGHT

For the foregoing reasons, Qualcomm requests that the Court affirm the Board's judgment finding claims 1, 2, 4, 18, 21, 22, 23, 81-84, 86, 88-91, 93, 94, 100, 113-116, 118, 119, 251-254, 256, 258-261, 263, 264, 281, 283-286, 288, 289, 293, 309-312, 314, 315, and 319 unpatentable. Qualcomm requests that the Court reverse the Board's finding that Qualcomm had not proven, by a preponderance of the evidence, that claims 25, 26, 363-366, 368, 369, 373 were unpatentable, and hold that those claims are also unpatentable.

Dated: January 16, 2018

Respectfully submitted,

*/s/ Eamonn Gardner*

EAMONN GARDNER
COOLEY LLP
4401 Eastgate Mall
San Diego, CA 92121
858.550.6000
egardner@cooley.com

ORION ARMON
COOLEY LLP
380 Interlocken Crescent, Suite 900
Broomfield, CO 80021
720.566.4000
oarmon@cooley.com

MATTHEW J. BRIGHAM
BENJAMIN G. DAMSTEDT
DENA CHEN
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304
650.843.5000
mbrigham@cooley.com
bdamstedt@cooley.com
dchen@cooley.com

*Attorneys for Cross-Appellants*
*Qualcomm Incorporated and Qualcomm Atheros, Inc.*

**UNITED STATES COURT OF APPEALS**
**FOR THE FEDERAL CIRCUIT**
*ParkerVision, Inc. v. Qualcomm Incorporated*,
Nos. 2017-2012, -2013, -2014 & -2074

## CERTIFICATE OF SERVICE

I, John C. Kruesi, Jr., being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by Cooley LLP, Attorneys for Cross-Appellants, to print this document. I am an employee of Counsel Press.

On January 16, 2018, counsel authorized me to electronically file the foregoing **Response and Cross-Appeal Brief of Cross-Appellants Qualcomm Incorporated and Qualcomm Atheros, Inc.** with the Clerk of Court using the CM/ECF System, which will serve via e-mail notice of such filing to any of the following counsel registered as CM/ECF users:

William Meunier
Sandra Badin
Michael Newman
Michael Timothy Renaud
Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
One Financial Center 6th Floor Boston MA 02111
617-348-1845
wameunier@mintz.com
sjbadin@mintz.com
mcnewman@mintz.com
mtrenaud@mintz.com

Upon acceptance by the Court of the e-filed document, six paper copies will be filed with the Court within the time provided in the Court's rules.

January 16, 2018 /s/ John C. Kruesi, Jr.
Counsel Press

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 28.1(e) and 32(a)(7)(B) and Fed. Cir. R. 32(a):

X The brief contains 12,729 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Fed. Cir. R. 32(f).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6):

X The brief has been prepared in a proportionally spaced typeface using MS Word 2013 in a 14 point Times New Roman font.

Dated: January 16, 2018

*/s/ Eamonn Gardner*
Eamonn Gardner
*Attorney for Cross-Appellant*